IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| MICHAEL E. LYDON, an individual, and | ) | |
| PATRICIA LYDON, an individual, and | ) | |
| MIKE LYDON ENTERPRISES INC., an | ) | |
| Oregon Corporation, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 170356R |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION**[1] |

Plaintiffs appealed Defendant's Notices of Deficiency, dated August 25, 2016, and

October 10, 2016, for the corporate tax years ending June 30, 2013, and June 30, 2014, and for

the individuals' tax years ending December 31, 2012, December 31, 2013, and December 31,

2014. A trial was held on June 21 and 22, 2018, in the courtroom of the Oregon Tax Court.

Kevin Shuba of Garrett Hemann Robertson P.C. appeared on behalf of Plaintiffs. Michael

Lydon (Lydon), Clark Williams (Williams), and Calvin "Skip" Palmer (Palmer) testified on

behalf of Plaintiffs. Plaintiffs called Penny DeTello (DeTello), an Oregon Department of

Revenue Conference Officer, as a rebuttal witness. Nancy Berwick (Berwick) and Genevieve

Traub appeared on behalf of Defendant. Berwick testified on behalf of Defendant. Plaintiffs'

Exhibits 1 to 55 were admitted into evidence without objection. Defendant offered Exhibits A to

OO, which were admitted except for KK, LL, MM and NN. Prior to the start of trial, the parties

---

[1] Plaintiffs timely filed its Statement for Costs and Disbursements on October 30, 2019. Defendant filed its objection on November 7, 2019, titled "Response to Motion(s)." The court's Final Decision incorporates its prior Decision without change in Sections I and II. The court's analysis and determination regarding costs and disbursements is contained in Section III.

stipulated to remove the audit adjustments based on the rollover of Plaintiffs' profit-sharing plan and for allowance of the net operating loss deduction as reported on the 2012 and 2013 corporate returns. At the conclusion of trial, the parties were given the opportunity to submit concurrent post-trial briefs by August 6, 2018. Plaintiffs filed a brief on August 3, 2018, and Defendant filed a brief on August 6, 2018. The parties each submitted rebuttal briefs after the deadline that were not reviewed.

## I. STATEMENT OF FACTS

A. *General Facts*

Lydon began building homes in 1975, working with various entities. In 2004, he formed Mike Lydon Enterprises Inc., an Oregon "C" corporation ("MLE"). (Exs A, B, 35 at 2.) Lydon is MLE's sole shareholder and, except for a brief period, the corporation did not have any employees. Lydon acted as the general contractor and he hired subcontractors to perform the work. Lydon's strategy was to purchase raw or developed land and build homes on the lower end of the cost spectrum. Lydon testified that the economy and housing were doing very well when he started, but business tapered off after 2008, due to the recession. Lydon testified that he sold his last properties in 2013 and waited until 2016 to end MLE operations to account for potential warranty work. He testified that MLE only made a profit for two or three years of its operation.

Palmer testified that he is a CPA in the state of Oregon, kept the books for MLE and prepared all the tax returns for the years at issue. For the period July 1, 2012, to June 20, 2013, MLE sold three houses and proceeds for the sales is contained in the corporation's 2012 tax return. Palmer testified that for taxpayers he generally initially put building costs in a Costs of Goods Sold (COGS) ledger, then moved them to inventory if the property was not sold by the

year's end because the COGS cannot be deducted until the year the property is sold. Palmer generally treated empty lots differently and put them immediately into inventory; but he acknowledged that he did not do so in all cases. Palmer testified that on MLE's 2012 tax return he did not list corporate inventory on the COGS form line 1, even though there was inventory. (Ex A at 6.) Palmer testified that the lack of an inventory figure does not impact the taxes for the year. Similarly, in MLE's 2013 tax return, a figure was erroneously noted for inventory at line 1. (Ex B at 6.) Williams agreed that for a corporation that has inventory (houses), costs can only be subtracted from corporate gross receipts when they are sold.

MLE's 2012 return for the period July 1, 2012, to June 30, 2013, documents gross receipts of $625,800, COGS of $603,308, and other deductions of $46,072, resulting in a loss of $25,571. (Ex A at 1.) Under loans from shareholders, the return shows that MLE owed $794,582 in shareholder loans at the beginning of the tax year and owed shareholder loans in the amount of $552,162 at the end of the year. (*Id* at 5.) MLE's 2013 return for the period July 1, 2013, to June 30, 2014, documents gross receipts of $240,000, COGS of $245,044, with other deductions of $17,056, resulting in a loss of $22,818. (Ex B at 1.) The return reports shareholder loans of $552,162 at the beginning of the year and $489, 001 at the end of the year. (Ex B at 5, 14.) Plaintiff's ledger for notes payable to stockholders also shows a balance as of June 15, 2013, at $552,161.51. (Ex H at 10.)

Defendant is requesting that its adjustments be upheld and that the 2014 COGS allowed in conference in the amount of $130,993 be disallowed for lack of substantiation.

B. *871 Fifth Street*

In 2007, Lydon purchased 26 lots in Jefferson, Oregon, ("Grice Acres") for $1,537,438.43. (Ex U at 3, 19; Ex 1.) The infrastructure of the subdivision was already in place

and the lots were ready for building. Lydon paid for the purchase using his own funds and title to the lots was placed in his name as an individual. (Ex U at 19-22.) Lydon testified that MLE was to build on the lots and the amount paid for Grice Acres was intended to be a loan to MLE. Lydon testified that after a home was built and ready to be sold, he would transfer title to MLE and then record the sale. Palmer recorded a journal entry dated December 31, 2007, showing an increase to notes payable to stockholder in the amount of $1,537,438.43 for Grice Acres; no contemporaneous loan documents were created, nor funds transferred to MLE. Defendant presented documents showing that most but not all of the deeds in Grice Acres were transferred from Lydon to MLE just prior to beings sold to third-party buyers.[2]

Lydon testified due to the recession and his desire to wind down his business, he entered into an agreement with Jacobe Construction, Inc. for them to build a home on 871 5th Street, also known as lot 27 of Grice Acres, and MLE would be paid $55,000 for the lot only when the property sold. He testified that Jacobe Construction built the house on the lot and he only incurred minimal cost. The Seller's Final Settlement Statement for sale of this property, dated April 14, 2014, shows consideration from the buyer of $194,250 with disbursements to MLE in the amount of $55,000 and the net proceeds of $130,993.36 to Jacobe Construction, Inc. (Ex P at 3.) Palmer testified that he recorded the transaction in MLE's books as sale of the lot for $55,000.

Berwick testified that she asked for a copy of the agreement between MLE and Jacobe Construction during the audit and never received it. She further testified that her audit notes reflect a conversation with Lydon's representative who stated the agreement was oral. At trial

---

[2] Lots 14 and 15 were transferred from Lydon to Jacobe Construction on October 13, 2010, for $110,000. (Ex U at 64.) Lot 24 was transferred from Lydon to MLE and Paulson Homes, Inc., for no consideration, on April 22, 2009. (Ex U at 85.)

Plaintiffs submitted a written agreement dated in late 2013 which states "Mike Lydon will receive payment for the lot of $55,000 upon completion and sale of the new home. If the sale does not happen by November 1, 2014 (approximately one year from the date of this agreement) Jacobe Construction will make monthly payments of $150.00 until the lot is sold." (Ex 27 at 4.) The typewritten agreement states the lot is "owned by Mike Lydon" but is interlineated by hand to add after Lydon's name "Enterprises Inc." Berwick also testified that she received a copy of the agreement in June 2017, a date which corresponds to the fax encoded date at the top of the document. *Id*. Berwick testified that she was given no evidence that Jacobe Construction built the house or any substantiation of the building costs. She treated the full purchase price minus minor expenses as MLE's gross profit but did not allow the proceeds allocated to Jacobe Construction to be considered as an offset to gross proceeds. DeTello testified that her conference decision agreed with Berwick's audit that the gross proceeds of the sale belong to MLE but allowed the amounts for Jacobe Construction to be deducted as COGS.

C. *824 Fir Cone Drive*

MLE purchased a lot which later became 824 Fir Cone Drive ("Fir Cone") on October 13, 2006, for $101,542.41. (Ex 21 at 3; Ex 7 at 127; Ex 8 at 11.) Lydon testified that he bought the lot to build a house for his daughter. The house was completed in 2010 and Lydon's daughter moved in. Despite living in the house for several years, she was unable to complete the purchase due to medical and personal issues. Lydon's daughter did not pay rent during the period she occupied the house. The house was marketed and eventually sold to a third party in 2013 for $255,900, and MLE received the net amount of $247,116.15. (Ex 46 at 2.) The parties stipulated at trial that the cost to build Fir Cone was $242,937.55. (See Ex 8 at 2.)

/ / /

Williams testified that Palmer transferred Fir Cone on the books from MLE to Lydon and deducted the amount from his shareholder loan even though in his opinion no transaction had actually occurred. He testified that no deed was recorded, and it was simply an accounting error. Further, although the error was also included in that year's corporate tax return, there was no tax consequence related to the error. Finally, assuming the audit was correct, he testified that there would be a distribution and profits.

Palmer testified that on June 20, 2010, he posted a journal entry removing the amount of $229,446.08 from the COGS ledger and subtracting it from Lydon's stockholder loan balance. (Ex. U at 8.) Palmer testified that he did not remember exactly why he performed the journal entries as he did, because costs for the property should have been in the inventory account until the house was sold. He testified that he was under the impression that Lydon was removing the house from corporate assets and was taking the house for personal use. He testified that in retrospect, the posting was in error. Palmer posted a general ledger correction of $4,287.62 out of the property (Ex U at 10), which he also asserts was a mistake and was corrected. On June 4, 2013, when Fir Cone sold, Palmer posted a journal entry for $233,733.70 putting the property into COGS and debited shareholder loans to correct the 2010 postings. (Ex U at 14.; Ex H at 15.)

Berwick testified that Lydon's daughter lived at Fir Cone for a period of at least one year, maybe more. She opined that this represented a sale of the property to her with zero basis; because Lydon did not personally pay for the property. Berwick testified that relying on the theory of "substance over form" led her to conclude that Fir Cone was transferred back from Lydon to MLE. She also asserted that the daughter's use of the property represented a benefit to Lydon and should be considered a dividend to him in 2010.

6

D. *Loans and/or Capital Contributions to MLE*

Lydon testified that MLE never paid him dividends and he took no wages during the tax years in issue. He testified that funds paid to him from MLE during the tax years in issue were repayment of loans he had made to the corporation. Williams testified that he is a lawyer in private practice concentrating on business and tax transactional work. He testified that he has represented Lydon and his spouse in the past but was engaged for this matter only toward the end of the audit and through the conference proceedings. Williams observed that there were no contemporaneously created loan documents or notations between Lydon and MLE in the corporate minutes or notes. During the audit Williams prepared loan documents and corrected corporation minutes and notes to reflect the intent of Lydon that he loaned money to MLE. Williams testified the documents he created and presented to the auditor, to memorialize loans from Lydon to MLE, were based on the accounting records created by Palmer. Williams testified that he did not have sufficient time to review the underlying documents prior to the auditor's deadline for response. Williams wrote a letter to Defendant stating "the notes themselves constitute the substantiation for the loans. I don't have documentation (bank statements) at this time to show the funds leaving the Lydon's bank account and entering the corporation's bank account, and vice versa."

Williams also testified that when Lydon transferred funds to MLE it would either be a capital contribution or a loan. When funds were transferred from MLE to Lydon, there were no profits, so the transfers would either be characterized as return of capital or repayment of a loan. Williams testified that in some cases there is difference in effect on taxes, but in this case, there would be no appreciable tax difference. Further, in either characterization, there is no tax consequence to Lydon for either return of capital or loan repayment. Williams testified that

documentation of loans to MLE do not have to be perfect considering the "overwhelming" evidence showing Lydon's intent to make loans to MLE.

Berwick stated that she asked for but did not receive any "bona fide" evidence of loans between Lydon and MLE; she only received a general ledger report created by Palmer. She noted that there were no promissory notes provided during the audit, and documentary evidence presented at trial evidencing loans were created just for the audit. She testified that if there was no proof of loans to MLE, then funds spent by MLE on Lydon's behalf or funds transferred to Lydon would either be constructive dividends or return of capital. She further testified that if MLE had no earnings or profits, monies transferred from MLE to Lydon would be return of capital up to the basis he had in MLE. Since she received no evidence of Lydon's basis in MLE, she considered funds from MLE to Lydon to be dividends. Berwick noted that MLE's 2012 corporate tax return documents Lydon's basis at $40,388. (Ex A at 5, line 22b.) Berwick testified that she was given no details to support Plaintiff's "Note Payable – Stockholder" ledger for the period from June 10, 2012, to June 30, 2015. (Ex U at 13-18.)

1.     *Loans from Lydon to MLE*

Lydon testified that over the years he transferred funds from his personal account to MLE that were intended to be loans. Lydon acknowledged that he did not create contemporaneous loan documentation or corporate minutes reflecting the loans and that he was unable to provide bank documentation underlying the transactions. He testified that he told his accountant (Palmer) that certain deposits were loans. Lydon presented as examples an MLE bank statement from July 2006 which shows a deposit of $200,000 deposit from his personal account, as evidence of contributions which represented loans to MLE. (Ex 34 at 2.) Similarly, he noted transfers from him to MLE in the amount of $100,000 on August 10, 2006 (Ex 34 at 3);

$160,953.54 on March 16, 2007, (Ex 34 at 4); $10,000 on January 28, 2013 (Ex 34 at 13.); $5,000 on March 11, 2013 (Ex 34 at 14); and $5,000 on April 5, 2013. (Ex 34 at 15.) The exhibit representing the "notes payable to stockholder" covers the time from August 15, 2004, through June 4, 2013. (Ex 1.) That document shows loans to MLE totaling $8,124,773.53. The largest transaction is dated December 31, 2007, when Lydon purchased the 26 lots of Grice Acres for $1,537,438.43. No funds were moved to MLE or deeds recorded to MLE at that time. Also, of note was a transaction on June 4, 2013, for the Fir Cone property in the amount of $233,733.70.

MLE's 2012 form 1120 shows loans from shareholders at $552,162 (Ex 9 at 5), but shareholder meeting notes show that the figure for the year ending June 20, 2012, was $1,028,315.44. (Ex 9 at 10.) On September 15, 2004, MLE's bank records show a deposit for $633,500 which is noted on notes payable ledger as a loan (Ex 1), but there is no evidence as to the source of the funds.

2.      *Payments from MLE for benefit of Lydon*

MLE bank accounts and credit cards were used extensively to make charitable contributions and pay bills which could represent personal or business expenses. Lydon and Palmer testified that personal expenses paid from MLE reduced Lydon's stockholder notes payable. Many of Lydon's personal expenses were paid through MLE: $15,823.15 for automobile expenses for the period July 15, 2012, through June 15, 2014 (Ex 16 at 15 and 16); $2,011.40 for dues and subscriptions (*Id*. at 16); and $5,913.69 for insurance. (*Id.* at 17.) MLE paid Lydon $300,000 on November 3, 2006, which is reflected in reducing MLE's note payable to stockholder by the same amount. (Ex 41 at 40). On August 30, 2013, MLE made a payment in the amount of $16,935.49 to Citi card. (Ex 40 at 5.)

### 3.     *Deviations from Lydon's loan evidence*

On October 13, 2010, Lydon sold lots 14 and 15 of Grice Acres to Jacobe Construction for $110,000. (Ex U at 64.) There is no evidence that the funds were paid to MLE. On April 22, 2009, Lydon transferred lot 24 of Grice Acres to MLE and Paulson Homes to "correct title." (Ex U at 85.) There is no evidence that funds were accounted for on MLE's ledger. (*See* Ex U at 5.)

## II. ANALYSIS

In analyzing Oregon income tax cases, the court starts with several general guidelines. First, the court is guided by the intent of the legislature to make Oregon's personal income tax law and the taxable income of corporations identical in effect to the federal Internal Revenue Code (IRC). ORS 316.007; ORS 317.013; ORS 317.018.[3] Second, in cases before the court, the party seeking affirmative relief bears the burden of proof and must establish their case by a "preponderance" of the evidence. ORS 305.427. Third, allowable deductions from taxable income are a "matter of legislative grace" and the burden of proof (substantiation) is placed on the individual claiming the deduction. *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992). Fourth, taxpayers are required to keep sufficient records to prove their tax liability. IRC § 6001.

### A. *"Cost of Goods Sold" ("COGS")*

Costs that are directly related to constructing a home must be capitalized. IRC § 263A; Treas Reg 1.263A–2; *Frontier Custom Builders, Inc. v. Comm'r*, 106 TCM (CCH) 393 (2013).[4]

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

[4] COGS is an adjustment to gross income for merchants and manufacturers and is computed with the proper adjustment for opening and closing inventories of goods for the year. See Treas Reg 1.61–3(a); Treas Reg 1.162–1. This is known as the inventory method of accounting. IRC §§ 471, 472. The income from a business of selling land

"[T]he costs of improvements to subdivided real estate held for sale are capital expenditures, allocable to the basis of the taxpayer in the various unsold lots." *Homes by Ayres v. Comm'r*, 795 F 2d 832, 835 (9th Cir 1986); *see also Estate of Ronning v. Comm'r*, 117 TCM (CCH) 1206 (2019). "Costs so capitalized may then be recovered by the builder upon the sale of the home." *Cartier v. Comm'r*, 97 TCM (CCH) 1042 (2009), 2009 WL 89216 at *2 (US Tax Ct). It is clear from the evidence presented that the "completed contract method" used by Plaintiffs is a permissible method. *See Shea Homes, Inc. v. Comm'r*, 142 TC 60 (2014).

1. *871 Fifth Street*

Taxpayers must show their entitlement to amounts claimed as costs and must keep sufficient records to substantiate those costs. IRC § 6001. Here, Plaintiffs provided proof that they purchased the lots including Lot 27 for $1,537,438.43. (Ex U at 19, 25-96.) This results in an initial cost basis of around $59,132 per lot. Defendant allowed additional costs of $8,560 for escrow and title costs related to the sale increasing the basis to $67,692. At audit, the auditor included the total sale price of $194,250 in gross receipts but did not allow the corresponding cost of $130,993 remitted to Jacobe Construction for building the house on the property. The conference officer allowed the full construction cost of $130,993, but Defendant now asks the court to disallow that cost for lack of substantiation.

In *Cartier*, the taxpayer's construction costs were denied where taxpayer submitted numerous receipts for construction-type items because taxpayer failed to prove that they were linked with the specific property that was sold and were unreliable. 2009 WL 89216 at *2-3 (for

---

and improvements to land cannot be computed under the inventory method of accounting. *W.C. & A.N. Miller Dev. Co. v. Comm'r*, 81 TC 619 (1983). The costs of constructing real property improvements is deductible in the year the property is sold. *Shaw Construction Co. v. Comm'r*, 35 TC 1102, 1121 (1961), *aff'd* on other grounds 323 F2d 316 (9th Cir 1963). In *Atlantic Coast Realty v. Comm'r*, 11 BTA 416 (1928), the court held that the inventory method as applied to various parcels of bare land that taxpayer held was imprecise and impractical.

example, some receipts were dated before taxpayer purchased the property in issue). There is no dispute that MLE owned the lot. There is likewise no dispute that when the lot was sold in April 2014 that it was improved by a house. The evidence presented to the court certainly links the expense to the specific property at issue, particularly the HUD statement showing that $130,993 was remitted to Jacobe Construction when the house was sold. This combined with Lydon's testimony and the contract with Jacobe construction make it more likely than not that the payment represented a cost that may be offset the income from the sale. Defendant's request to adjust this item is denied. The conference officer's decision is affirmed.

  *2. Fir Cone*

  Defendant denied certain costs associated with building and sale of the Fir Cone house. Defendant argues that Lydon's purpose was to build a house, not for business profit, but for his daughter and when Palmer moved the property from "inventory" to "notes payable shareholder" it reflected a change to the home becoming a personal asset. When that transaction occurred, Defendant argues, no consideration was paid by Lydon to MLE and Lydon's basis was zero. Additionally, Defendant argues that Lydon's daughter lived in the house for more than a year which represented a benefit to Lydon, a shareholder, and thus constituted a constructive dividend to him. Plaintiffs argue that no real transaction occurred; MLE purchased the property, did not change title to the property (despite Lydon's intention to take the property for personal use) and MLE sold the property to a third-party buyer. Plaintiffs urge the court to look at the substance of the transaction and allow costs to offset gross profits received from sale of the property.

  Looking at transaction as a whole, the court is persuaded that no transfer of the property to Lydon's daughter occurred. Even if the court accepted that a transfer occurred, Defendant provided no authority for its idea that a gifting real property strips the basis to zero. *See* IRC §

1015 (providing basis of gift is same as donor's or the fair market value at the time of transfer). It is true that no business expense deduction should be allowed for the period when Lydon's daughter occupied the house rent-free but that is not the issue before the court. *See Van Malssen v. Comm'r*, 108 TCM (CCH) 549 (2014), 2014 WL 6603868 at *4 (Us Tax Ct) (personal use includes use by qualifying relatives). Likewise, IRC Section 267 prohibits losses being claimed upon property transfers between closely related persons. *Miller v. Comm'r*, 75 TC 182 (1980). Defendant has failed to show that such a transfer occurred. The transfer at issue is between MLE and an unrelated third-party. The court agrees that when Lydon's daughter moved into the property for a period of at least one year, a benefit was conferred to Lydon. However, an adjustment for imputed rent was not contained in Defendant's audit or assessment, and thus Defendant had the burden of proof at trial to present evidence on that issue. Without evidence on the value of the lost rent, the court cannot make an adjustment.

B. *Evidence of Shareholder Loan or Return of Capital*

In general, funds distributed from a corporation to a shareholder are taxable under IRC Section 301(c). A distribution is taxed to the distribute shareholder as a dividend to the extent of the corporation's earnings and profits. Any excess is treated as a nontaxable return of capital to the extent of the shareholder's basis in the corporation, and any remaining amount is taxable to the shareholder as gain from the sale or exchange of property. *See* IRC §§ 301, 316. Diverting funds from C corporations to controlling shareholders are taxable as dividends and not subject to treatment as repayment of shareholder loans where the shareholder loans are not sufficiently evidenced. *Knutzen-Rowell, Inc. v. Comm'r*, 101 TCM (CCH) 1293 (2011), 2011 WL 990160 (US Tax Ct). "Such a diversion may also occur where a controlling shareholder causes the corporation to pay his or her personal expenses and the payment primarily benefits the

shareholder and is made without expectation of repayment or without a bona fide intent that it be in repayment of a shareholder loan." *Id*. at *13. Courts consider a number of non-exclusive factors to determine whether there is a bona fide loan including: (1) whether a note or other evidence of indebtedness exists; (2) whether interest is charged; (3) whether a fixed repayment schedule was established; (4) whether there was collateral; (5) repayments made; (6) whether lender had reasonable expectation of repayment; (7) conduct of parties. *Id*.

Federal and state tax decisions are filled with references acknowledging that certain business expenses, deductions, or loans likely occurred but cannot be allowed because the evidence is so lacking that the decider cannot even estimate what those amounts would be. Such is the case here. Lydon's testimony was persuasive that he transferred funds from time to time from his personal bank account to, or on behalf of, MLE, and those transactions were intended to be loans. But in analyzing the evidence, the court sees transactions accounted for in very unorthodox ways. When there are documents they are deficient. And most importantly there is a complete lack of separation between Lydon's personal and corporate accounts. Plaintiffs assert that the loan documents and corporate minutes "themselves constitute the substantiation for the loans." (Ex S at 51.) The court disagrees. First, the documents were created retroactively, back-dated, and solely for the audit. They were drafted years after the purported transactions and without reliance on primary documentation. The court has previously opined that back-dated documents created solely for an audit are given little weight except to the extent that they reflect the economic realities of the time as shown by objective and contemporaneous evidence. *See*, *Hannon v. Dept. of Rev*., TC-MD 160324R, WL 3037507 at *3 (Or Tax M Div July 18, 2017).

Further, the ledgers offered here are not reliable, often contradicting other ledgers, and evidence supporting loans is lacking. As an example, Plaintiffs' submitted a ledger purportedly

documenting shareholder loans from Lydon to MLE, for the period 2004 through June 4, 2013, in the amount of $8,124,473.53. (Ex 1.) The general ledger accrual basis for notes payable ended at $552,161.51 as of June 15, 2013. (Ex 16 at 10.) Promissory notes from MLE to Lydon appear to be more than $12 million. These figures do not match corporate tax return figures for MLE's 2012, 2013, or 2014. Only a handful of the purported loans on this ledger are supported by documentary evidence— a check, a bank statement or other evidence. Even those transactions for which substantial trial time was expended have issues. For example, Lydon purchased 26 lots of Grice acres using personal funds and titled the lots in his own name. Setting aside Defendant's assertion that no money changed hands and the deeds were not immediately recorded in MLE's name and thus there was no loan, Lydon's testimony is most compelling on this point. Lydon argues that his plan was to deed the lots to MLE just before the lots with finished houses are sold to a third party. As acknowledged by Plaintiffs' attorney and CPA, that is probably not the best way to transact business, but the court understands the plan. However, lots 14 and 15 appear to be sold from Lydon to Jacobe Construction, and the funds did not go to MLE. (Ex U at 64.) Similarly, lot 24 appears to be transferred to a third party but there is no evidence money went to MLE. There is also the mistaken entry for $233,733.70 "loan" for Fir Cone dated June 4, 2013. (Ex 16 at 10.) The end result is that there are no bona fide shareholder loans to the corporation and even on a capital contribution theory Lydon left MLE badly under-capitalized resulting in no basis in MLE. The court finds that return of capital theory unconvincing.

Aside from the loan side, there is the repayment side. Seldomly did MLE pay Lydon directly by check. Instead, MLE paid Lydon's credit card bills, other miscellaneous bills, and charitable contributions. These payments represented hundreds of thousands of dollars without

adequate substantiation. In taking all the above in account, the court generally believes that Lydon loaned MLE some money at some time between 2004 and 2013, but the court is unable to even estimate the amount. The evidence before the court shows that MLE had no accumulated earnings and profits and that its sole shareholder had insufficient basis in the company to cover the amounts disbursed to him. The court finds that any distributions made in excess of Lydon's basis in MLE should be taxable as capital gains under IRC § 316(a). *See Han v. Comm'r,* 83 TCM (CCH) 1824 (2002), WL 1298745 at *31 (US Tax Ct). Thus, the audit adjustment is sustained.

## III. COSTS AND DISBURSEMENTS

Plaintiffs' request an award of costs and disbursements in the amount of $330.32 including the filing fee ($265); "Subpoena – Penny DeTello" ($13); and "Mileage – Salem to Portland and return to deliver exhibits to ODOR reps" ($52.32). No receipts were attached. Defendant objects to Plaintiffs' request on the basis that only Plaintiff MLE is a prevailing party and the statement for costs and disbursements did not identify the party to which the costs relate. Defendant also asserts that some information was not provided during the earlier audit.

The court has discretionary authority to award costs and disbursements to prevailing parties under ORS 305.490(2); *Wihtol I v. Dept. of Rev.*, 21 OTR 260, 267-68 (2013). Costs and disbursements "are reasonable and necessary expenses incurred in the prosecution or defense of an action other than for legal services * * *." TCR–MD 16 A.[5] A party is a prevailing party if they receive a favorable outcome on a claim. ORS 20.077(2); *see e.g. Ellison v. Dept. of Rev.*, 362 Or 148, 166, 404 P3d 933 (2017) (a party is prevailing if they successfully defend against the other party's claim). "[I]t does not necessarily follow that, merely because a party does not obtain all the relief sought, a party is not a prevailing party." *Kohl's Dept. Stores v. Washington*

---

[5] Tax Court Rule–Magistrate Division

*County Assessor*, TC-MD 130220D, WL 196150 at *13 (Or Tax M Div Jan 14, 2015) (internal quotations committed). The court must "weigh what was sought by each party against the result obtained." *Id*. Defendant concedes that Plaintiff MLE prevailed in this matter. Plaintiffs Michael and Patricia Lydon did not prevail on their claims before the court, however they did receive some relief on the issue of the rollover distribution from the profit-sharing plan by the parties' stipulation before trial; at a minimum, Plaintiffs did not put themselves in a worse position. The court is satisfied that both Plaintiffs are prevailing.

The issue becomes whether the court should exercise its discretion to award costs and disbursements in this case. The court is guided by *Wihtol II v. Multnomah County Assessor*, TC-MD 120762N, WL 274126, (Jan 24, 2014), which noted that failure to comply with timely filing requirements or to provide information at an earlier administrative proceeding might make a cost award inappropriate. The court has held that a cost award might be denied where there are "multiple claims or issues that were variously won or lost by the parties." *Chiles v. Multnomah County Assessor*, TC-MD 130384N, WL 2993791 at *9 (Jul 3, 2014) (internal citation omitted). Such is the case here. This case involved multiple claims and parties. The court's task was simplified by the fact that the parties were able to resolve two of the issues before trial. It appears that these issues could have been resolved without appeal if Plaintiffs had been more forthcoming with information during the audit. On the issues that remained, Plaintiffs won on the deductibility of the costs from the Fir Cone and 871 5th Street properties for the 2013 tax year but lost on the issue of shareholder loans for both years. The shareholder loan issue was the more significant issue. The court notes that the case was complicated by Plaintiffs' poor record keeping and that the outcome was by no means apparent. The court finds that an award of costs and disbursements is inappropriate under the circumstances.

## IV. CONCLUSION

After careful consideration, the court concludes that Plaintiffs are eligible to deduct costs from the gross proceeds on the sales of the Fir Cone and 871 5th Street properties. Plaintiffs have failed to meet their burden of proof that funds transferred from MLE to Lydon represented either repayment of loans or return of capital. Consequently, the transfers represent capital gains under IRC §§ 316, 301. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is granted in part and denied in part. Plaintiffs shall be allowed to deduct costs from the gross proceeds from the sales of the Fir Cone and 871 5th Street properties. Plaintiffs' appeal is also granted, pursuant to the parties' stipulation, with respect to the rollover of Plaintiffs' profit-sharing plan and for allowance of the net operating loss deductions as reported MLE's 2012 and 2013 tax return. The remainder of Plaintiffs' appeal is denied.

IT IS FURTHER DECIDED that Plaintiffs' request for costs and disbursements is denied.

Dated this ____ day of November 2019.

RICHARD DAVIS
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Richard Davis and entered on November 22, 2019.*